### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JLS MEDICAL, LLC, individually and on behalf of all others similarly situated,<br><br>         Plaintiff,<br><br>  v.<br><br>SELAH GENOMICS INC.,<br><br>         Defendant. | Case No.<br><br><br><br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Plaintiff JLS Medical, LLC, ("JLS Medical," "JLS" or "Plaintiff"), by and through its attorneys, brings this action on behalf of itself and all others similarly situated, and alleges as follows:

### INTRODUCTION

1. JLS Medical is a sales management company that markets, promotes and sells medical products and services to physicians and healthcare providers. David Sweet is JLS's chief executive officer and sole employee.

2. Selah Genomics, Inc. ("Selah Genomics" or "Defendant"), is a professional medical testing laboratory that provides various testing and other medical services.

3. Throughout the Class Period, Selah Genomics, through various third parties, offered JLS Medical and the Class the opportunity to promote and sell Selah Genomics' COBAS HPV testing services. It represented to Plaintiff and the Class that they would monetize their promotional and sales efforts each time a physician sent a patient specimen to Selah Genomics for testing. Specifically, if a patient's medical sample was sent to Selah Genomics, the patient's

insurer would remit payment to Selah Genomics, and then a certain percentage of that payment was supposed to be remitted to Plaintiff and the members of the Class.

4.    Defendant's representations, however, were made without any reasonable basis. Selah Genomics is considered as an "out-of-network" lab by most, if not all, insurance providers. Selah Genomics' "out-of-network" status means that its services are considerably more expensive than "in-network" alternatives. Because comparable and readily available "in-network" alternatives to Selah Genomics COBAS HPV testing services exist, few, if any, patients would ever allow their specimens to be sent to Selah Genomics for testing.  As a result, JLS and other members of the Class would be unable to monetize their promotional and sales efforts because no physician would ever send patient specimens to Selah Genomics.

5.    Notwithstanding these business realities, Selah Genomics uniformly represented to Plaintiff and the Class that it would bill all patients at "in-network" rates, regardless of whether the patient's insurer considered Selah Genomics as "out-of-network." These representations were repeated upon direct questioning by Plaintiff and other members of the Class.

6.    Specifically, Jennifer Lawrence, the Vice President of Business Development at Selah Genomics, directly represented to sales agents, including Plaintiff and the Class, that all patients would be billed as "in-network."  On April 24, 2015, Lawrence emailed Plaintiff a written billing letter addressed to physicians (attached as Exhibit A, and hereinafter referred to as the "Physician Billing Letter" or "Physician Letter").

7.    The Physician Letter memorialized Jennifer Lawrence's "in-network" representations in writing, and specifically stated, "Regardless of our contract status with your

patient's insurance company, your patient's *only out of pocket responsibility is for their in-network individual co-insurance and/or deductible.*" *See* Exhibit A (emphasis in original).

8.     Later, on June 18, 2015, Jim Henry, the Vice President of Selah Partners, emailed Plaintiff a written billing letter addressed to patients (attached as Exhibit B, and hereinafter referred to as the "Patient Billing Letter" or "Patient Letter"). Selah Genomics instructed Jim Henry to send this letter to Plaintiff. The Patient Letter again memorialized Jennifer Lawrence's "in-network" representation in writing, and specifically stated, "Regardless of our contract status with your insurance company, you will only be responsible for your in-network individual co-pay and/or deductible." *See* Exhibit B.

9.     Both of these written billing letters also were widely disseminated to members of the Class, both via email and in hard copy form.  Selah Genomics openly encouraged Plaintiff and the Class members to rely on both billing letters, and to use them in the promotion and sale of Selah Genomics' services.

10.     Selah Genomics' oral representations, as well as the billing letters, induced Plaintiff and the members of the Class to invest significant money, time, business reputation, and good will in order to market, promote and sell Selah Genomics' medical testing services. *Indeed, absent Selah Genomics' representations, no economically rational sales agent would have, or could have, sold Selah Genomics' services.*

11.     On August 14, 2015, less than four months after it disseminated the Physician Billing Letter, less than two months after it disseminated the Patient Billing Letter, and only after Plaintiff and the Class invested considerable money and time in marketing and promoting Selah Genomics' services, and used their business reputation and goodwill to convince physicians and healthcare providers to send patient specimens to Selah Genomics for testing, Selah Genomics

3

revoked its "in-network" billing policy, and altogether exited the business of directly marketing its services to patients, physicians and healthcare providers.

12.    Selah Genomics revoked its "in-network" billing policy because the policy was incapable of implementation. Selah Genomics improperly vetted its "in-network" billing policy, and disseminated the "in-network" billing policy without knowing whether it could be implemented.  Once Selah Genomics began implementing its "in-network" billing policy, it quickly discovered the policy's deficiencies, and revoked it as a result.

13.    Absent Selah Genomics' negligent misrepresentation regarding the feasibility of its "in-network" billing policy, Plaintiff and the Class never would have put their business reputations on the line, and never would have invested significant money in selling Selah Genomics' services.

14.    As a direct and proximate result of Selah Genomics' negligent misrepresentations, Plaintiff and the Class have lost their investments, and their business reputation and goodwill have been damaged irrevocably.

15.    Accordingly, Plaintiff brings this action, on behalf of itself and the Class, and seeks to recover lost investment, lost profits, and loss of business reputation and goodwill, in an amount to be determined at trial.

## JURISDICTION AND VENUE

16.    This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and cost, and Plaintiff and all members of the Class are citizens of different states than Defendant.

17.    Alternatively, this Court has diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(a), because this is a class action involving more than 100 class

4

members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and many members of the class are citizens of states different from Defendant.

18.    Venue in this judicial district is proper under 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this district.

## PARTIES

19.    Plaintiff JLS Medical, LLC, is a Pennsylvania sales management company with its principal place of business in Philadelphia, Pennsylvania.  Plaintiff is sub-contracted to RJ Kitchen, also a sales management company, to promote and sell Selah Genomics' testing services.  RJ Kitchen has contracted with many sales management companies similar to JLS Medical to promote and sell Selah Genomics' services.  RJ Kitchen is subcontracted to Selah Partners (also known as NextGen), which is a sales management company that directly contracts with Selah Genomics to handle all sales agents/companies promoting and selling Selah Genomics' services.

20.    JLS Medical, along with the other sales management companies and individuals that promoted and sold Selah Genomics' services, monetize their promotional efforts when a physician/healthcare client sends a patient specimen to Selah Genomics for testing. When the patient's insurance pays for processing of the specimen, JLS Medical, as well as the other sales agents, retain a certain percentage of that payment.

21.    Defendant Selah Genomics Inc., is a Delaware corporation with its principal place of business located at 411 University Ridge, Suite A, Greenville, South Carolina 29601.

## FACTUAL BACKGROUND

22.    Selah Genomics is an independent medical testing laboratory that provides various diagnostic testing services and products.

5

23.     Among its provided services, Selah Genomics offers physicians, healthcare providers and patients the ability to analyze and process the COBAS HPV test, developed by Roche Molecular Diagnostics.

24.     The COBAS test is a qualitative *in vitro* test used for detection of Human Papillomavirus ("HPV").  The COBAS test is superior at detecting HPV in women, and also is unique because it is the only Food and Drug Administration ("FDA") approved HPV test capable of being run in isolation.  Other HPV screens must be run in conjunction with Papanicolaou ("PAP") testing (called "co-testing").

25.     Rather than directly market its ability to analyze and process the COBAS test, Selah Genomics relied on a third-party sales force to promote and sell its COBAS testing services to physicians and healthcare providers.

26.     Although Selah Genomics' ability to analyze and process the superior and unique COBAS test was a selling point for its third-party sales force, Selah Genomics' services were not marketable on this selling point alone.

27.     There are a number of HPV tests, such as the Aptima test, which are FDA-approved, and also are effective at screening for HPV.

28.     These tests are provided by large, nationwide laboratories that have "in-network" contracts with many of the nation's largest insurance companies, meaning the tests are billed at cheaper rates.

29.     By contrast, Selah Genomics is an independent medical testing lab that does not have "in-network" contracts with most, if not all, medical insurance providers. As a result, Selah Genomics and its medical testing services, including its COBAS testing services, are considered as "out-of-network" by almost all medical insurance plans.

30.     Selah Genomics "out-of-network" status, combined with the availability of effective and FDA-approved "in-network" HPV testing services, make Selah Genomics COBAS services unmarketable on their own.

31.     Patients rarely, if ever, allow their physicians to utilize an "out-of-network" service when a comparable "in-network" service is available.  For the overwhelming majority of patients, save a handful of exceptional cases, the superior and unique benefits of Selah Genomics' "out-of-network" COBAS testing is far outweighed by the higher cost of Selah Genomics' services and the availability of effective and significantly cheaper "in-network" alternatives.

32.     Given the fact that few, if any patients would allow physicians to send their specimens to Selah Genomics' for testing, no reasonable sales agent would invest time, money, business reputation or good will in an effort to promote and sell Selah Genomics' COBAS services.  Sales agents only monetize their marketing and promotional efforts when physicians send patient specimens to Selah Genomics for testing.  Because few, if any patients allow their physicians to utilize an "out-of-network" service, no physician would end up sending patient specimens to Selah Genomics. As a result, it would be economically irrational for any sales agent to promote and sell Selah Genomics' services.

33.     Recognizing that its COBAS services were not marketable alone, and that no sales agent would choose to promote its services in isolation, Selah Genomics uniformly represented to all third-party sales agents, including Plaintiff and the members of the Class, that *all* patients, whether their insurance considered Selah Genomics as "in-network" or "out-of-network," would be billed as if Selah Genomics was considered as an "in-network" laboratory.

7

34. At first, Selah Genomics disseminated this "in-network" billing policy orally, through Jennifer Lawrence, Selah Genomics' Vice President of Business Development, and through Jim Henry, Selah Partners' Vice President. Both Jennifer Lawrence and Jim Henry encouraged sales agents, including Plaintiff and the Class members, to rely on this information and use it to promote and sell Selah Genomics' services.

35. By providing this information to its sales agents and encouraging them to rely on it, Selah Genomics represented that its "in-network" billing policy was legitimate and capable of implementation.

36. With this information, sales agents began investing time, money, business reputation and good will in an effort to promote and sell Selah Genomics' services, believing that Selah Genomics had the capability to bill all patients as "in-network."

37. Notwithstanding Selah Genomics assurances, physicians and healthcare providers refused to believe it was possible for an independent lab to treat all patients as "in-network."

38. Some sales agents, including Plaintiff and other members of the Class, in an exercise of due diligence, relayed these concerns directly to Selah Genomics.

39. To cite just one example, in mid- to late-April, Plaintiff called Jennifer Lawrence and Jim Henry, and explained that his physician and healthcare customers needed to see the "in-network" billing policy in writing.

40. In response to Plaintiff's request, on April 24, 2015, Lawrence emailed Plaintiff the Physician Billing Letter on Selah Genomics' company letterhead. The letter explicitly stated, "Regardless of our contract status with your patient's insurance company, your patient's *only out of pocket responsibility is for their in-network individual co-insurance and/or deductible*." *See* Exhibit A (emphasis in original).

41.    Jennifer Lawrence, both in April and May, assured JLS, as well as RJ Kitchen, the sales management company that JLS is contracted to, that the "in-network" billing policy had been vetted through Selah Genomics' attorneys, and that JLS, and other sales management companies/agents, should rely on the policy and use it to sell and promote Selah Genomics' services.

42.    The Physician Billing Letter was disseminated to more than 50 sales agents. The sole purpose of the Physician Letter was to allow Plaintiff and members of the Class to sell the viability and legitimacy of Selah Genomics' services.

43.    Notably, although the Physician Billing Letter generally was welcomed by the physicians to which Plaintiff and the Class promoted Selah Genomics' services, some physicians still refused to believe that it was possible for an independent lab to treat all patients as "in-network."  Other physicians remained concerned about being overwhelmed by calls from patients with questions about Selah Genomics' unique billing procedures.

44.    Plaintiff and members of the Class again relayed these concerns to Selah Genomics, and sought reassurance from the Company.

45.    For example, in early June of 2015, Plaintiff called Jim Henry of Selah Partners and asked if Selah Genomics would be willing to craft a billing letter directed to patients instead of physicians.  Jim Henry said he would relay these concerns to Selah Genomics.

46.    In response to Plaintiff's inquiry, Selah Genomics instructed Jim Henry to email Plaintiff the Patient Billing Letter.  On June 18, 2015, Jim Henry sent Plaintiff an email with the Patient Billing Letter attached.  The Patient Billing Letter explicitly stated, "Regardless of our contract status with your insurance company, you will only be responsible for your in-network individual co-pay and/or deductible."  *See* Exhibit B.  The policy also instructed the patient not

to call their physicians about billing related issues, but rather to contact Selah Genomics with questions. *Id.*

47.    Again, Selah Genomics provided over 50 sales agents with Patient Billing Letter. The Patient Billing Letter was sent to Plaintiff and other sales agents so they could rely on, and use the letter in their sale and promotion of Selah Genomics' services.

48.    By providing the Physician and Patient Billing Letters to Plaintiff and the Class, Selah Genomics represented that its "in-network" billing policy was feasible and capable of implementation. Selah Genomics encouraged Plaintiff and the Class members to rely on this information in promoting and selling Selah Genomics' services.

49.    On the basis of this written re-affirmation, Plaintiff and the members of the Class invested considerable time, money, business reputation and good will in an effort to promote and sell Selah Genomics' services, believing that Selah Genomics' "in-network" billing policy was legitimate and that Selah Genomics' was capable of treating all patients as "in-network."

50.    Plaintiff's experience is illustrative of the effect Selah Genomics' Physician and Patient Billing Letters had on the members of the Class as a whole.  By the first week of July 2015, Plaintiff had invested considerable time, money, business reputation and good will in promoting Selah Genomics' services on the representation that those services were capable of being billed exclusively as "in-network."

51.    As a result of Plaintiff's investment and effort, in the first week of July 2015, Plaintiff's clients sent their first approximately 100-125 specimens to Selah Genomics for testing.  Based on this, and Plaintiff's continuing efforts, Plaintiff projected that his clients would continue sending specimens to Selah Genomics with increasing volume and frequency.  In fact,

JLS Medical projected physicians and healthcare providers to send 1000 specimens in August, 1800 in September, and over 3000 in October.

52.    On July 17, 2015, a matter of weeks after Plaintiff's clients began sending specimens to Selah Genomics for testing, Plaintiff received a call from Jim Henry, Vice President of Selah Partners.

53.    In a complete reversal of Selah Genomics' prior representations, Mr. Henry informed Plaintiff for the first time that Selah Genomics believed its "in-network" billing policy was deficient.    Specifically, Mr. Henry explained that Selah Genomics was questioning the feasibility of its "in-network" billing policy, and that, as a result, Selah Genomics probably would not be able to honor its policy.

54.    Mr. Henry contacted Plaintiff again on July 20, 2015, and confirmed that Selah Genomics was revoking its "in-network" billing policy.  On this call, Mr. Henry also explained that Selah Partners had trained over 100 independent sales representatives for the promotion and sale of Selah Genomics' COBAS testing services.

55.    On August 14, 2015, less than a month after Jim Henry informed Plaintiff of the deficiencies with Selah Genomics' "in-network" billing policy, and just months after Selah Genomics provided written affirmation regarding its "in-network" billing policy, Selah Genomics sent out a letter (attached as Exhibit C) to its third-party sales force stating that Selah Genomics was no longer processing COBAS tests through its "in-network" billing policy. *See* Exhibit C.  The letter stated that this change was "driven by market dynamics." *Id.*

56.    On information and belief, Selah Genomics' stated reason for its change in policy is a falsehood.

11

57.    Selah Genomics revoked its "in-network" billing policy because the policy was illegitimate and incapable of implementation.  Rather than conduct a reasonable and diligent investigation into whether the "in-network" billing policy was feasible, Selah Genomics haphazardly constructed its "in-network" policy, and then disseminated the policy with intent to induce third-party sales agents to act on the information contained therein and promote and sell Selah Genomics' services to physicians and healthcare providers.  Nor did Selah Genomics properly vet the billing policy after it was questioned by Plaintiff and other members of the Class.  Or when physicians similarly raised questions about it.  Rather, in each of these cases, Selah Genomics negligently "doubled down" on its representations that its billing policy was feasible, to the extreme economic detriment to Plaintiff and the Class.

58.    Plaintiff and the members of the Class have suffered great and irreversible harm as a result of Selah Genomics' negligence.

59.    Absent Selah Genomics' uniform misrepresentations that it could treat all patients as "in-network," Plaintiff and the Class never would have invested time, money, business reputation and good will in promoting and selling Selah Genomics' COBAS testing services.

60.    For example, before Selah Genomics stated that it would treat all patients as "in-network," Plaintiff and other members of the Class quickly learned that Selah Genomics' services were unmarketable.  Even after Selah Genomics stated that it would treat patients as "in-network" Plaintiff still had difficulty promoting and selling Selah Genomics' services.  It was only after Selah Genomics put its policy in writing that Selah Genomics' services became marketable.

61.    Plaintiff, as well as other members of the Class, undertook substantial investment in their promotional and sales efforts when they saw how receptive healthcare professionals were

12

to Selah Genomics services on the representation that these services were capable of being billed as "in-network" to all patients.

62.   As a result of Selah Genomics' negligence, Plaintiff's and the Class members' investments have been lost.

63.   Plaintiff and the Class also have lost substantial profits as a result of Selah Genomics' negligence.

64.   Finally, Plaintiff and the members of the Class have suffered great harm to their reputations in the medical sales industry as a result of Selah's uniform misrepresentations, which will undoubtedly cause them severe economic harm for years to come.

65.   The success of medical industry sales representatives (like Plaintiff and other members of the Class) is largely dependent upon the long-term business relationships they build with physicians, hospitals and other healthcare providers.   Indeed, many sales representative clients are repeat customers, who continue to do business with a particular sales representative due to past positive experiences.

66.   Selah Genomics' conduct, as alleged herein, has done substantial and lasting harm to the business reputations of Plaintiff and the Class.   Plaintiff and the Class were questioned repeatedly by healthcare professionals that Selah Genomics' "in-network" billing policy could not be done.   Plaintiff and the members of the Class raised these questions directly with Selah Genomics, as described above, and were repeatedly re-assured that the "in-network" billing policy was feasible and capable of implementation.   As a result of Selah Genomics' unequivocal written assurances to Class members, physicians and healthcare providers alike, Plaintiff and the Class suffered severe economic injury.

## CLASS ALLEGATIONS

67.    Plaintiff brings this action, on behalf of itself and all others similarly situated, pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3). The Class Plaintiff seeks to represent are defined as follows:

> All persons/entities in the United States, who/which promoted and sold Selah Genomics' COBAS testing services and who/which were provided information concerning Selah Genomics' "in-network" billing policy between September 30, 2013, and September 30, 2015 (the "Class Period").

68.    Excluded from the Class are Defendant and its parents or subsidiaries, any entity in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns.  Also excluded are any Judges to whom this case is assigned as well as his or her judicial staff and immediate family members.

69.    Numerosity: The Class described above is so numerous that joinder of all individual members in one action would be impracticable.  The disposition of the individual claims of the respective Class members through this class action will benefit both the parties and this Court, and will facilitate judicial economy.  The Class members are readily ascertainable through records kept by Defendant and other sales agents/management companies.

70.    Typicality:  Plaintiff's claims are typical of the claims of the members of the Class.  Specifically, Selah Genomics' services were not marketable absent its representation that all patients would be billed as if they were "in-network."  As such, Plaintiff and the Class members' who received information regarding Selah Genomics' billing policy and thereafter choose to market, promote and sell Selah Genomics' services must have relied on the negligently vetted information because no reasonable sales agent would sell Selah Genomics' services absent Selah Genomics' "in-network" billing policy.

71.     Commonality and Predominance:  There are common questions of law and fact to all members of the Class, the answers to which will advance the resolution of the claims of the Class members. These questions predominate over any individual questions. The common questions include, but are not limited to:

a)  Whether Defendant was negligent in vetting its "in-network" billing policy;

b)  Whether Defendant owed a duty to Plaintiff and the Class;

c)  Whether Defendant misrepresented that it could treat all patients as "in-network" regardless of whether the patient's insurance contract labelled Defendant as "out-of-network" or "in-network;"

d)  Whether Defendant intended or knew that sales agents would rely on its "in-network" billing policy to promote and sell Defendant's services to physicians, healthcare providers and patients;

e)  Whether Defendant's "in-network" billing policy was so material to the marketability of Defendant's services that no reasonable sales agent would have invested time, money, business reputation and good will absent Defendant's written "in-network" billing policy representations;

f)  Whether Plaintiff and the Class members received information about Defendant's "in-network" billing policy;

g)  Whether Plaintiff and the Class have suffered damages as a direct and proximate result of Selah Genomics' negligence misrepresentations; and

h)  Whether Plaintiff and the Class are entitled to any other relief.

72.     Adequacy:   Plaintiff is an adequate representative of the Class because its interests do not conflict with the interests of the members of the Class.  Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the Class members and has no interests antagonistic to the Class members.  Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation.

73.     Superiority: A class action is superior to all other available methods of fairly and efficiently adjudicating this dispute. The injury sustained by each Class member, while

15

meaningful on an individual basis, is not of such magnitude that it is economically feasible to prosecute individual actions against Defendant. Even if it were economically feasible, requiring possibly hundreds of injured plaintiffs to file individual suits would impose a significant burden on the court system and almost certainly lead to inconsistent judgments. By contrast, class treatment will present far fewer management difficulties and provide the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

74.     If the court finds that class certification is inappropriate under 23(b)(3), Plaintiff, in the alternative, seeks class certification under Federal Rule of Civil Procedure 23(c)(4) to adjudicate questions of law and fact common to the Class members. Plaintiff seeks a determination of the following common questions of fact and law:

a) Whether Defendant was negligent in vetting its "in-network" billing policy;

b) Whether Defendant owed a duty to Plaintiff and the members of the Class;

c) Whether Defendant negligently represented that it could treat all patients as "in-network" regardless of whether the patient's insurance contract labelled Defendant as "out-of-network" or "in-network;"

d) Whether Defendant intended that sales agents such as Plaintiff would rely on its "in-network" billing policy to promote and sell Defendant's services to physicians, healthcare providers and patients;

e) Whether Defendant's "in-network" billing policy was so material to the marketability of Defendant's services that no reasonable sales agent would have invested time, money, business reputation and good will absent Defendant's "in-network" billing policy representations.

## CAUSES OF ACTION

### NEGLIGENT MISREPRESENTATION

75.     Plaintiff incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

76.     Defendant is in the business of conveying information for the guidance of others in business transactions.  Defendant utilizes third party sales agents to sell its diagnostic services and products.  Selah Genomics provides these sales agents with information about its services and products so that the sales agents can sell Selah Genomics' services and products for Selah Genomics' pecuniary benefit.

77.     Defendant knows and, in fact, intends that third-party sales agents who sell its products and services rely on the information it provides about its products and services in the sales agents' regular course of business.

78.     Here, Defendant had a direct pecuniary interest in the sale of its COBAS testing services.  By supplying information about a billing policy that treated all patients as "in-network," Defendant hoped to induce sales agents to invest time, money, business reputation and good will in promoting and selling its COBAS services and enjoy monetary gain as a result.

79.     Because Defendant supplied information to Plaintiff and the Class for Defendant's own pecuniary gain, and also intended and knew that the information would be used by Plaintiff and the Class in the course of their business activities, Defendant owed a duty to Plaintiff and the members of the Class as sales agents of Defendant's COBAS testing services.

80.     Defendant breached its duty of care to Plaintiff and the members of the Class by negligently misrepresenting that it could bill all patients as "in-network" for its medical testing services.

81.     Defendant's "in-network" misrepresentations were material to its sales agents' decision to invest in Defendant's services, and promote and sell those services, because without this misrepresentation, it was economically infeasible for sales agents to sell Defendant's "out-of-network" COBAS services to physicians and healthcare providers. As such, absent

17

Defendant's "in-network" representations, no reasonable sales agent would have invested time, money, business reputation and good will in Defendant's services.

82.    Defendant's "in-network" misrepresentations were made under circumstances in which Defendant ought to have known of its falsity. Had Defendant made a reasonable investigation into the feasibility of its "in-network" billing policy it would have discovered that the policy was deficient.  In fact, when Defendant finally vetted its policy, long after it disseminated the policy with intent to induce action on part of its third-party sales agents, Defendant discovered the impracticability and illegitimacy associated with its negligently constructed and disseminated "in-network" billing policy.

83.    As a professional medical laboratory, Defendant should have known that its billing policy was unworkable. Defendant, however, failed to sufficiently examine and investigate its stated billing policy.  Had Defendant reasonably examined and investigated its policy it would have known the policy was defective.  Thus, Defendant made its "in-network" misrepresentations under circumstances in which Defendant ought to have known of their falsity.

84.    Defendant intended to induce third-party sales agents, including Plaintiff and the Class to act on its "in-network" misrepresentations.  Defendant recognized that few, if any, medical patients would buy its services and that no healthcare professional would refer their patients to Defendant absent Defendant's "in-network" billing policy.  Defendant concurrently recognized that no sales agents would promote or sell its services if healthcare professionals and their patients were not interested in utilizing them.  Accordingly, Defendant disseminated its "in-network" billing policy in an effort to induce sales agents to promote and sell its services.

85.    Plaintiff and the Class members acted in justifiable reliance on Defendant's misrepresentations.  Defendant is a professional medical laboratory intimately familiar with state

18

and federal regulatory laws applicable to the medical and health services industry, and also exclusively familiar with its own finances and contractual relationships. By contrast, Plaintiff and the Class members are sales persons, who, based on information provided them by medical professionals, sell medial products and devices to other medical professionals. As a result, Plaintiff and the members of the Class justifiably relied on the information provided to them by Selah Genomics, a professional medical laboratory.

86.    Plaintiff and the Class members all relied on Defendant's misrepresentations. Selah Genomics' "out-of-network" services were not marketable absent its "in-network" misrepresentations.  As a result, no reasonable sales agent would invest time, money, business reputation, or good will in Selah Genomics' services without assurances that the services were capable of "in-network" treatment.  Accordingly, each member, by the mere fact that they decided to invest in, promote and sell Selah Genomics' services relied on Defendant's misrepresentations.

87.    Defendant's negligent misrepresentations were the proximate cause of damage to Plaintiff and the members of the Class.  As a result of Defendant's misrepresentations, Plaintiff and the Class invested substantial time, money, business reputation and good will in Defendant's services on the belief that Defendant was capable of providing those services on an "in-network" basis.  Plaintiff and the Class members have lost their investments and been damaged in an amount to be proven at trial.

88.    Plaintiff and the Class also have been damaged through harm to their business reputation and goodwill.  Plaintiff and the Class assured their clients that Selah Genomics was capable of providing "in-network" billing to all patients for its "out-of-network" services.  The clients of Plaintiff and the Class members trusted Plaintiff and the Class and sent specimens to

Selah Genomics and referred patients to Selah Genomics as a result. When Selah Genomics revoked its policy, the trust between Plaintiff and the Class members, and their clients was broken. As a result of this damage, Plaintiff and the Class members have incurred loss of sales and profits in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this court enter judgment against Defendant and in favor of Plaintiff and the members of the proposed Class and award the following relief:

a. That this action be certified as a class action pursuant Federal Rule of Civil Procedure 23, declaring Plaintiff as the representative of the proposed Class and Plaintiff's counsel as counsel of the proposed Class;

b. Monetary damages;

c. Reasonable attorneys' fees and expenses, including those related to experts and consultants;

d. Costs;

e. Pre- and post-judgement interest; and

f. The provision of whatever other relief the Court deems just, equitable and appropriate.

Dated: 11 / 3 / 16

Respectfully submitted,

/s/

R. Bruce Carlson (PA56657)
bcarlson@carlsonlynch.com
Edwin J. Kilpela, Jr. (PA201595)
ekilpela@carlsonlynch.com
**CARLSON LYNCH SWEET**
**KILPELA & CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Phone: (412) 322-9243
Fax: (412) 231-0246

20